AETNA INSURANCE COMPANY, etc.,
Plaintiff,

v.

Lester C. NEWTON et al., Defendants.

Civ. A. No. 3024.

United States District Court,
D. Delaware.

Aug. 5, 1970.

As Modified Aug. 6, 1970.

Roger Sanders, Prickett, Ward, Burt & Sanders, Wilmington, Del., for plaintiff.

Harold Schmittinger, Schmittinger & Rodriguez, Dover, Del., for defendant C. F. Schwartz, Inc.

E. D. Griffenberg, Jr., Potter, Anderson & Corroon, Wilmington, Del., for defendant Continental Insurance Co.

## FACTS

STEEL, District Judge:

This is a declaratory judgment action in which Aetna Insurance Company ("Aetna"), the plaintiff, has sought a determination of the respective rights and liabilities of two trucking companies and their cargo insurance carriers resulting from damage to a shipment of frozen food.

Defendants C. F. Schwartz, Inc. ("Schwartz") and Lester C. Newton Trucking Company ("Newton") were motor carriers operating under Certificates of Public Convenience and Necessity granted by the Interstate Commerce Commission. Aetna was the cargo insurance carrier for Newton and defendant Continental Insurance Company ("Continental") was the cargo insurance carrier for Schwartz under Policy No. MTC–3335.

During the period of time in question, the area of authority to operate granted to Newton by the Interstate Commerce Commission extended from the Town of Camden, Kent County, Delaware, north into Pennsylvania, New Jersey and New England. The area of authority to operate granted to Schwartz by the Interstate Commerce Commission extended to the town of Camden, Delaware from points in Maryland. Beginning in 1961, when the transportation of goods originated in the area where either Schwartz or Newton was authorized to operate and was destined to a point in the operating area of the other, the two companies began the practice of interchanging trucks and drivers at Camden to avoid the necessity of off-loading and re-loading cargo at Camden. Prior to April 18, 1963, Newton and Schwartz conducted their interchange operations pursuant to a verbal understanding that if a loss occurred in the area of ICC authority of one of the two carriers, that carrier would be liable for the loss. The relevant portions of the policy which Continental issued to Schwartz were all in existence during the time when this oral agreement was in effect and continued without change until after the cargo loss occurred.

The oral agreement between Newton and Schwartz remained in force until April 18, 1963, when a written agreement (Master Interchange Agreement) was signed, a copy of which is attached to the complaint. Under this agreement, instead of each carrier being liable for cargo loss which occurred in its territory of ICC authority, the company with whom the shipment originated assumed the entire responsibility for any damage to a shipment of goods prior to its arrival at destination regardless of

the area of ICC authority in which the damage occurred. This was accomplished by paragraph 4C(2) of the Master Interchange Agreement which provided that the initial carrier would indemnify the receiving carrier against any claim for loss or damage to any shipment being transported in the vehicle.

Both before and after the written agreement was executed, cargo moving north from Maryland on vehicles owned by Schwartz or under long term lease to Schwartz, with Schwartz drivers or drivers leased by it, was taken to Camden, Delaware and was there interchanged. This was accomplished by Newton's signing an interchange settlement sheet and other documents and by placing a Newton sign on the vehicle. Thereafter the same Schwartz driver or Schwartz leased driver, driving the same Schwartz truck or Schwartz leased truck, continued the trip north through Newton's area of authority to points in Pennsylvania, New Jersey and New York. The reverse procedure was followed when goods originated in Newton's area of ICC operating authority for destination in Schwartz' area of ICC operating authority.

On July 27, 1963, Schwartz picked up at Salisbury, Maryland, goods owned by the Campbell Soup Company for delivery to a destination in Pennsylvania. The shipment was pursuant to a through bill of lading. The cargo was interchanged with Newton at Camden, Delaware in the manner previously described. After the interchange, while the truck was en route to its destination, a failure of the refrigeration equipment in the truck occurred somewhere in Pennsylvania with resultant damage to the goods.

Newton paid Campbell, the shipper, the amount of the loss and counterclaimed against its cargo insurance carrier, Aetna, for reimbursement. A judgment was entered in favor of Newton against Aetna pursuant to a stipulation between them.

As a result, Aetna became subrogated to Newton's rights and obtained a sum-mary judgment against Schwartz under the indemnification provision of paragraph 4C(2) of the written interchange agreement. Aetna Insurance Company v. Newton, 274 F.Supp. 566, 570–573 (D. Del.1967). Schwartz appealed but the appeal was dismissed as premature since no order had been entered under Rule 54(b), and the liability of Continental, the insurance carrier of Schwartz, under a cross claim which Schwartz had filed against Continental based upon the policy of insurance which it had issued to Schwartz, had not been decided. Aetna Insurance Company v. Newton, 398 F.2d 729 (3d Cir. 1968).

The remand of the Court of Appeals requires this Court to resolve the undetermined question of Continental's liability to Schwartz. The case is now before the Court upon cross motions of Schwartz and Continental for summary judgment, both parties agreeing, and the Court holding, that no disputed issues of relevant fact exist.

### Continental's Policy
### No. MTC—3335

The pertinent terms of the Continental policy, insofar as Schwartz' claim is concerned, are contained in the policy itself plus a rider and an endorsement. The policy names the insured, specifies the period of insurance, and provides that the policy is subject to "the Rider hereto attached" which is "made a part of this policy, together with such other provisions, agreements or conditions as may be endorsed hereon or added hereto * * *."

Attached to the policy are the rider and the endorsement. The first is denominated "Motor Truck Merchandise Rider-Carrier's Receipts Form." This sets forth the basic coverage of the policy. Paragraphs 1 and 2 specify the goods insured, conditions of insurance, and state that the policy is intended

"1. To cover only the liability of the Assured, as hereinafter provided, in respect to all kinds of lawful goods and/or merchandise accepted by the

Assured for transportation, consisting principally of canned goods, food and coal.

\* \* \* \* \* \*

2. While the goods and/or merchandise are in the custody and control of the Assured and are:

(a) In or on Motor Trucks, Trailers and/or Semi-Trailers operated by and/or for the Assured

(1) In transit between points and/or places within the Continental Limits of the United States and/or Canada \* \* \*."

Thereafter paragraph 5 of the rider states that:

"THIS INSURANCE COVERS

\* \* \* \* \* \*

The liability of the Assured, as a common carrier or private carrier or under bills of lading or shipping receipts, for loss of and/or damage to the goods and/or merchandise caused by:

(a) Fire \* \* \*.

(b) Collision \* \* \*.

(c) Overturn of the conveyance.

(d) Collapse of Bridge or Culvert.

(e) Theft \* \* \*."

Paragraph 7 states broadly the purpose of the insurance:

"It is the purpose of this insurance, subject to the foregoing provisions and to the conditions of the basic policy, to indemnify the Assured only to the amount which the Assured shall become liable to pay and shall pay in respect of the merchandise and/or goods." [1]

It is to be noted that paragraph 5 of the Motor Truck Merchandise Rider-Carrier's Receipts Form fails to specify as a risk insured against the liability of the assured for loss or damage to frozen foods resulting from the mechanical breakdown of refrigeration equipment on motor trucks. This risk is assumed by an additional endorsement which reads:

"It is further understood and agreed that this policy covers the Assured's legal liability for loss or damage to frozen foods resulting from mechanical breakdown of refrigeration machinery or equipment on motor trucks, trailers and/or semi-trailers operated by and for the Assured."

■ Schwartz argues that only this endorsement, which specifically deals with the loss in question need be considered and that the rider is irrelevant. Continental, on the other hand, contends that the rider and the endorsement together govern the rights of the parties. The contention of Continental is the more reasonable and is accepted. The terms of the policy must be gleaned from considering all of its provisions as unitary parts of the whole and as such be construed together. The basic coverage of the policy is contained in the Motor Truck Merchandise Rider. Paragraph 5 specifies the risks which are covered. The endorsement relating to liability arising from the breakdown of refrigeration machinery is an additional risk covered by the policy. It is tantamount to an amendment to paragraph 5 of the Motor Truck Merchandise Rider and must be treated as such.

When the two riders are interpreted in the light of each other, it follows that Continental's liability to Schwartz for damage to frozen foods resulting from the mechanical breakdown of refrigerating equipment is limited by the terms of both the frozen food endorsement and Motor Truck Merchandise Rider-Carrier's Receipts Form. By paragraph 5

[1]. Initially, Continental pleaded as its fifth affirmative defense to Schwartz' cross claim, Schwartz' failure to show payment to Aetna which paragraph 7 of the rider makes a condition precedent to the operation of Continental's obligation to indemnify. This defense, however, was never argued by Continental in its briefs against Schwartz and was waived by Continental in response to a direct written inquiry by the Court. *See* Court's letter, dated Aug. 15, 1969, at 1–2; Supp. Brief of Continental in Support of its Motion for Summary Judgment on the Cross Claim of Schwartz, at 1 et seq.

of the latter, the insurance is restricted to

"[T]he liability of the Assured, as *a common carrier or private carrier or under bills of lading or shipping receipts* * * *." (emphasis added)

The critical question is whether the claim which Schwartz is asserting against Continental is for a liability of Schwartz falling within this category.

Schwartz is a common carrier authorized by the ICC to perform certain interstate transportation services. As a common carrier, Schwartz issues bills of lading and shipping receipts. The liability which Newton established against Schwartz, however, was not based upon any statutory[2] or common law liability of Schwartz as a common carrier or issuer of bills of lading or shipping receipts. It rested solely upon an indemnification agreement, voluntarily entered into by Schwartz, which was embodied in the Master Interchange Agreement. It cannot reasonably be supposed that simply because Schwartz was a common carrier it expected to obtain or Continental intended to provide indemnification against any contractual liability with respect to damaged goods which Schwartz saw fit to assume as an incident to its transportation services. Since Continental's obligation to indemnify Schwartz was limited to liabilities of Schwartz arising because of its status as a common carrier or because of its issuance of bills of lading or shipping receipts, Schwartz' claim against Continental was beyond the coverage of the policy.

Not only the policy terms, but reason also supports this conclusion. Prior to the execution of the Master Interchange Agreement, Newton and Schwartz operated under an oral agreement. It provided that, as between Newton and Schwartz, if a loss occurred, that carrier in whose territory of ICC authority the loss occurred would bear it (Newton dep., filed Sept. 15, 1967, at 45–46, 49; Hamstead dep., filed Sept. 15, 1967 at 32, 83–4). There was no reason for Schwartz to carry insurance against a loss in Newton territory for which it had no liability under its verbal agreement with Newton. Although the execution of the Master Interchange Agreement altered the oral agreement by making the initial carrier (whether Newton or Schwartz) liable for any damage to cargo during the entire route, no change was made in the terms of the policy. The policy could only mean what it meant when the oral agreement was in effect. The indemnification clause, under which Schwartz' liability to Newton was established, was not in existence prior to the Master Interchange Agreement and could not have been intended by the parties to be covered by the policy which antedated that agreement.[3]

Virtually all of the discussion of the parties has been directed to the issue whether after Schwartz had interchanged with Newton, the damage occurred while the cargo was in the "custody and control" of Schwartz or in a truck "operated by and/or for" Schwartz. This issue becomes irrelevant once it is realized that

---

2. As an example of statutory liability, see 49 U.S.C. §§ 20(11), 319. These sections provide that a certified motor common carrier which receives property for interstate transportation shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder for damage to the property caused by it or by any common carrier to which the property may be delivered. This statute makes the issuer of the receipt or bill of lading responsible for the damage to cargo regardless of whether it occurs before or after an interchange. The Continental policy implicitly recognized this statutory obligation of Schwartz but limited the amount of Continental's indemnification of it to $1,000. *See* endorsement denominated "Endorsement for Motor Common Carrier Policies of Insurance for Cargo Liability Under Section 215 of the Interstate Commerce Act."

3. Actually, the policy went into effect in 1957 before the oral interchange agreement was entered into in 1961. What relationship, if any, existed between Newton and Schwartz prior to when the policy was executed is not revealed by the record.

the policy did not purport to cover the voluntarily assumed contractual liability of indemnification.[4]

### The Construction of the Parties

 It is generally held that interpretation by the parties to a contract, as disclosed by their action, is entitled to be given great weight by the court in construing the agreement. 3 A. Corbin, On Contracts § 558 (1960); *see* Canister Co. v. National Can Corp., 71 F. Supp. 49, 50 (D.Del.1946), wherein Judge Leahy adopted the frequently quoted words of Lord Chancellor Sugden in Attorney General v. Drummond, 1 Drury & Warren 353, 368, "Tell me what you have done under such a deed, and I will tell you what that deed means."

Correspondence[5] between Schwartz and representatives of Continental discloses that Newton and Schwartz recognized that their insurance policies covered only losses occurring in their respective areas of operating authority and therefore they sought to change their coverage so that the insurance company of the initial carrier would insure the cargo over the entire route.

On February 26, 1963, before the loss occurred, Hammond, the vice president of Schwartz, wrote to Harrison, of Poor, Bowen, Bartlett & Kennedy, the insurance brokerage firm which had issued the Continental policy and said that since August 1960 Schwartz and Newton had been interchanging equipment at Wyoming, Delaware. Hammond called Harrison's attention to the fact that under the verbal interchange agreement:

"Schwartz [was] insured from origin to Wyoming, Delaware and at Wyo-

ming, Delaware Newton assumes the insurance." [6]

Hammond continued by saying that Newton wanted to change the prevailing insurance so that the initial carrier, whether Schwartz or Newton, would insure the cargo over the entire route. Hammond said:

"Newton Trucking approached me on our company insuring this interline traffic the entire mileage when the equipment used is that owned or operated by Schwartz. And Newton insuring the traffic the entire mileage when Newton equipment is used." [7]

Hammond wanted to know how Continental would feel about this change and said:

"In order to determine whether or not I favor this, I must hear from you regarding your position of insuring Schwartz with PL-PD and cargo coverage while transporting products under the Newton name. And whether or not your company would be exempt from liable [sic] when the Newton firm transports cargo under the Schwartz name." [8]

Harrison answered on March 8, 1963 and stated that he had been discussing the insurance problem with Markel Service and enclosed a copy of a letter dated March 6, 1963, which he (Harrison) had received from Markel Service.[9] The latter letter stated that:

"It is quite possible that the company will be willing to issue *an endorsement* which will hold the Newton Trucking Company harmless while the insured (C. F. Schwartz, Inc.) is operating over the operating authority of

---

4. Compare Newton's policy with Aetna, appended to Complaint as Exhibit B, which provided that:
 "This Policy covers the liability of the Assured as a carrier, either imposed by law *or as may be assumed by contract,* for physical loss or damage * * * to lawful goods * * *." (emphasis added)

5. The correspondence quoted is appended to Continental's Request for Admissions, filed Jan. 21, 1969.

6. *Id.,* Exhibit E.

7. *Id.*

8. *Id.*

9. The identity of Markel Service is not disclosed but apparently it was a company which performed a trucking insurance service.

Newton Trucking Company." (emphasis added) [10]

Markel then proposed that the Continental policy be endorsed to have the following effect:

"[T]his endorsement will indemnify Newton while the insured's [Schwartz'] equipment is operating over Newton's authority. By the same token, the same endorsement should be attached to cover Schwartz while Newton is operating over Schwartz's authority." [11]

From the foregoing it is clear that Schwartz knew before the cargo loss that the policy would protect it from loss in Newton's territory only if the policy were endorsed by Continental to this effect. Yet, when the damage occurred, the policy had not been so endorsed.

Again, after the cargo damage had been sustained, Schwartz recognized that the coverage which existed would have to be changed by endorsement to impose liability on the initial carrier for loss after an interchange. On July 30, 1963, Hammond wrote to Harrison and said:

"It is my understanding from Warren Hamstead of L. C. Newton Trucking Co. that Newton's Insurance carriers will be notified that both carriers are now ready to proceed with insuring this traffic from origin to destination when it is moved on its equipment. Warren and I discussed the possibility of setting September 1, 1963 as the initial date for this to take place. However, prior to having such a thing take place, *I would like to have an endorsement.*" (emphasis added) [12]

A further indication that neither Continental nor Schwartz believed that the policy covered losses incurred while cargo was being transported in Newton's operating area is the fact that revenue received by Schwartz for the portion of the trip following the interchange was not reported to Continental for the purpose of computing premiums. The frozen food endorsement required Schwartz to pay a premium for the endorsement on the basis of its "gross receipts received" for the transportation of frozen foods. Under paragraph 4B of the Master Interchange Agreement Schwartz was entitled to receive 87% of Newton's division of revenues received on interchange and vice versa.[13] During the period April 11, 1963 to July 27, 1963, the date of the cargo loss, Schwartz received $24,818.53 out of Newton's division of the revenue. Schwartz reported none of this to Continental for the purpose of computing premiums due under the frozen food endorsement (Schwartz' Ans. to Continental's Interrogatories, par. 3(c), filed Dec. 26, 1968).

Schwartz attempts to explain away its interpretive action by asserting that agents of Continental led it to believe that the Continental policy did not cover losses after interchange to Newton (Hammond Aff., par. 24, filed Mar. 3, 1969). But Schwartz was not bound to accept the interpretation offered by the insurance agents. Schwartz makes no claim of coercion or that a fiduciary relationship existed between Continental and Schwartz.

Schwartz' alternative contention is that when the parties expressed the need for a further policy endorsement to expand its coverage to losses in Newton's territory they were merely expressing a legal conclusion as to the ultimate legal question for judicial decision. But this is always the case where the construction of a contract by the parties is accepted by the Court as evidence of the meaning of the contract.

10. Continental's Request for Admissions, filed Jan. 21, 1969, Exhibit G.

11. *Id.*

12. *Id.*, Exhibit I.

13. The division of revenue to which the 87% was applied was calculated on a "Mileage Prorate" basis. *See id.*, Exhibit E, paragraph 2.

Because of the conclusion, for the reasons stated, that Schwartz' contractual liability to indemnify Newton was a risk outside the policy coverage it is unnecessary to consider the other contentions of the parties.

The motion of Continental for summary judgment will be granted and that of Schwartz will be denied.